IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STACI WILLIAMS, | § | |
| | § | |
| Plaintiffs; | § | |
| | § | |
| v. | § | CIV ACTION NO. 3:11-CV-00397-P |
| | § | |
| THE CITY OF DALLAS, TEXAS, | § | |
| | § | |
| Defendant. | § | JURY TRIAL DEMANDED |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

**TO THE HONORABLE JUDGE OF SAID COURT:**

**COMES NOW** Plaintiff Staci Williams ("Plaintiff" or "Williams") and files this First Amended Complaint against Defendant the City of Dallas, Texas ("Defendant" or "the City"), and respectfully shows the Court as follows:

**I.
PARTIES**

1. Plaintiff Staci Williams is a female adult citizen who resides in the State of Texas and worked for the City of Dallas as a full-time municipal court judge from 2006 to 2010. Plaintiff alleges, *inter alia*, that she experienced harassment, discrimination and retaliation based on sex, disability, and taking FMLA leave by the City of Dallas and its policy makers, agents and/or employees.

2. Defendant, The City of Dallas, Texas, is a municipal corporation under the laws of the State of Texas, located within Dallas County, Texas. The City of Dallas may be served through the mayor, clerk, secretary, or treasurer pursuant to Texas Civil Practice & Remedies Code section 17.024(b) at Dallas City Hall, 1500 Marilla Street, Dallas, Texas 75201.

## II.
## JURISDICTION AND VENUE

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. section 1331 and 28 U.S.C. section 1367(a). The action arises under, and is brought pursuant to, the Constitution and laws of the United States.

4. The Court also has jurisdiction to hear this matter under the Texas Commission on Human Rights Act ("TCHRA"), which expressly waives sovereign immunity otherwise enjoyed by Texas municipalities for lawsuits involving employment discrimination and retaliation. Similarly, sovereign immunity is abrogated by 42 U.S.C. section 2000e ("Title VII"), 42 U.S.C. section 12202 ("ADA"), 29 U.S.C. section 2601 et seq. ("FMLA"), and 42 U.S.C. section 1983 ("Section 1983"), which allow direct claims against municipalities.

5. Williams has exhausted her administrative remedies by filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission ("TWC") on November 10, 2009. The EEOC issued a Notice of Right to Sue on November 30, 2010, which Williams received on December 11, 2010.

6. Venue is proper in the District Court for the Northern District of Texas, Dallas Division, pursuant to 42 U.S.C. section 2000e(5) because it is the district in which the unlawful employment practice was committed, the judicial district in which the employment records relevant to such practice are maintained and administered, and the judicial district in which the aggrieved person worked or would have worked but for the alleged unlawful employment practice. Venue is further proper pursuant to 28 U.S.C. section 1391 as a substantial part of the events or omissions giving rise to the claims occurred in this district.

## III.
## NATURE OF THE CLAIM

7. Williams seeks actual and compensatory damages based on the City's harassment, discrimination and retaliation against her based on sex, disability, and taking FMLA leave in violation of Section 1983, the TCHRA, the ADA, the FMLA, and Title VII, which culminated in the City failing to rehire her as a municipal court judge.

## IV.
## WORKPLACE DISCRIMINATION, HARASSMENT, AND RETALIATION

8. In May of 2006, based on the recommendation of the Judicial Nominating Committee ("JNC"), the City hired Williams as a full-time municipal court judge for a two-year term.

9. In Williams's position as a municipal court judge, one of her duties was to sign search warrants presented to her. In 2007, she signed the second highest number of search warrants (90), where, in comparison, fellow Municipal Court Judge Phyllis Lister-Brown only signed nine (9) search warrants, Judge Cheryl Williams signed twenty (20), and Judge Victor Lander signed sixty-one (61).

10. Municipal court judges also are required to sign arrest warrants. In 2007, Williams signed one hundred ninety-six (196) arrest warrants, where the judge with the second highest number of signed warrants was Administrative Judge Jay Robinson with eighty-one (81). During the period January 1, 2008 through July 9, 2008, Williams signed the second highest number of arrest warrants of any municipal court judge.

11. During Judge Williams's first full term on the bench, Judge Victor Lander was also a municipal court judge. Throughout her tenure, Williams increasingly started noticing Lander making inappropriate and unwanted comments to and advances on her.

12. Williams tried to ignore Lander's inappropriate comments and advances, but Lander's conduct continued.

13. In early to mid-2008, then serving Administrative Judge Jay Johnson completed his "Judicial Performance Evaluation" of Williams. He evaluated Williams on her first two years as a full-time municipal court judge. He rated Williams "excellent" to "superior" in every category, including judicial temperament, judicial ethics, desire to understand the law, collegiality and work ethic. In or around August of 2008, after serving her first two-year term, Williams was reappointed as a full-time municipal court judge for another two-year term.

14. At this same time, Lander was appointed Administrative Judge for the Municipal Court.

15. As now Administrative Judge, Lander began subjecting Williams to retaliatory conduct and creating a hostile work environment.

16. The Municipal Court Judiciary's tradition and usual protocol is to assign judges to specific courts and dockets by seniority, with the Magistrate Court (which was the least desirable at the time because there was no trial work and the docket mainly consisted of the processing of paperwork) being assigned to the judge with the least seniority. In September 2008, Judge Lander made an exception to this practice, choosing to assign Williams to the Magistrate Court, even though there were two other municipal court judges with less seniority.

17. Not only did Lander assign Williams to the Magistrate Court, but he substantially increased her docket. He increased the number of defendants Judge Williams's Magistrate Court was to see each morning from 50 to 75, increased the number of defendants each afternoon from 40 to 65, and removed the restrictions on the number of cases each defendant could present to the Court. The net effect of Lander's reapportionment of work was to cause Williams to have 272%

more citations (on average, 191 citations) handled each morning than any other court and 252% more citations (on average, 101 citations) handled each afternoon than any other court.

18. When Williams brought the disparate treatment to Lander's attention, Lander ignored Williams. Instead, Lander gave additional work to Williams. Williams was required to review 60 "Mail-In Off Docket" motions per month, while other judges reviewed 3-4 per month. Williams's Thursday afternoon "study afternoons" were eliminated, while all other municipal court judges were permitted to keep these breaks. Further, Williams was assigned to mentor 7 new associate judges, while other judges were only assigned 3 new associate judges. These tasks were in addition to Williams' heavy docket and her responsibilities to perform jury orientation each morning.

19. Additionally, Lander's unwelcome comments and advances towards Williams continued.

20. On October 30, 2008, during the signing of a warrant for a Dallas Police Officer, Lander came into Williams's office, uninvited, and commented in an inappropriate tone that he "liked the color of [her] lipstick." Lander then turned to the officer and stated, "Oh, we have to compliment women. They think that we don't notice such things."

21. In May of 2009, when Williams went to Lander's office to inquire about getting credit for the two hours of compensatory/FLEX time Lander promised her and another judge for working the Homeless Docket on a Saturday morning, Lander, in front of his assistant, Oweda Miller-Johnson, stated, "You need to shorten your dress, it is too long. You need to wear your dresses short like Oweda."

22.     Later that month, Lander made another inappropriate comment to Williams in front of a female Associate Judge, stating "Hey Judge Williams, that is an ugly bruise on your leg. . . just shows the kinky sex you are into."

23.     Lander's retaliation, harassment and discrimination continued by failing to provide Williams with the tools she needed to complete her heavy workload.  Williams requested that she be provided a computer on the bench, like every other municipal court judge. Lander ignored Williams's request for over three months.  It was only when City Councilman David Neumann visited Williams's court and noted the lack of a computer on her bench that the situation was corrected.

24.     As Williams continued to rebuff Lander's advances and ignore his retaliatory, harassing and discriminatory actions, Lander's conduct escalated, including increasingly making and documenting allegations of minor violations against her.  Lander's memoranda containing these one-sided allegations were often hostile, accusatory and lacked objectivity.  The memoranda were rarely about her performance on the bench, but were rather minor administrative issues, ranging from parking in the wrong parking spot to entering the wrong code on her timesheets to using too much paper.  Williams was often unaware of the complaints, and when/if she became aware, was not permitted to respond or otherwise defend herself, despite repeated requests.

25.     Williams continued to attempt to perform her duties to the best of her abilities.  In addition to her heavy docket and other duties, Williams developed a community service booklet for the public regarding volunteer opportunities, worked with Dallas Police Department officers at all hours of the night to get warrants signed, and volunteered on weekends to help with the Homeless Docket.  On January 12, 2009, Chief of Police David M. Kunkle sent a letter to Williams commending her and providing his personal thanks for her assistance with search

warrants during the December 2008 months and the New Year's holiday, during which she worked an eight-hour shift (8:00 p.m. to 4:00 a.m. on New Year's Eve) to help local police.

26.   In January 2009, due to suffering nausea, chest pains and other medical problems related to the exhaustion of handling the increased workload and stress of trying to comply with the newly-imposed minimum requirements Lander put in place, Williams applied for, was approved, and took FMLA leave.

27.   While on FMLA leave for only one day, Lander (rather than mailing a letter or calling) sent two Municipal Court bailiffs to Williams's house to deliver a letter regarding her FMLA leave.  In the letter, Lander instructed Williams to return to work the next day, further attempting to harass, intimidate and humiliate her.  Williams remained on FMLA leave.

28.   After Williams went on FMLA leave, Lander received complaints from the other municipal court judges that the load for the Magistrate Court (which Williams had been handling but which was now being handled by other judges) was too large.  Less than six days after Williams went on FMLA leave, Lander began modifying the Magistrate Court's docket.  He reduced the number of defendants being seen each day, reduced the number of citations that each defendant could present in a day, re-distributed the "Mail-In Off Docket" motion responsibilities so that they were (once again) divided equally among the full-time judges, implemented early cut-off times when defendants and attorneys could enter the Magistrate Court, and implemented a mandatory lunch period.

29.   By July 2009, Williams had had enough.  Although she had been communicating with the City's Human Resources Department orally for several months, she realized that Lander's inappropriate behavior was not going to stop and that it would likely become an issue she would have to address in writing.

30. On July 11, 2009, Williams sent the City's Director of Human Resources, David Etheridge, a letter detailing her concerns about Lander's inappropriate comments and advances, as well as his retaliation against her.

31. On August 19, 2009, when Lander's harassment, discrimination, and retaliation had not stopped, Williams sent Etheridge another letter detailing her continued concerns about Lander's behavior.

32. On September 30, 2009, aware of the harassment allegations made by Williams against him, Lander prepared and signed an Interim Performance Evaluation regarding Williams, giving her a score of 15.75 out of 20. Williams was the only judge who was not provided with an in-person interview to discuss the evaluation. Lander's evaluation of Williams was substantially lower than the Judicial Performance Appraisal (that is based on the same factors and criteria) that former Administrative Judge Jay Robinson completed on March 31, 2008, where Williams received a score of 18 out of 20. Additionally, Lander's evaluation of Williams included negative comments about Williams's performance related to her taking FMLA leave.

33. It was not until November 2, 2009, nearly five months after Williams's initial complaint to the City's Human Resources Department, that the City provided any response to Williams concerning her complaints against Lander for harassment, discrimination and retaliation. The City failed to take any action.

34. On November 10, 2009, after realizing that the City was not going to make a good faith effort to work with her to investigate her complaints, Williams filed a claim against the City with the Equal Employment Opportunity Commission and the Texas Workforce Commission for harassment, discrimination and retaliation based on sex, disability, and taking FMLA leave.

35. On December 18, 2009, Williams sent the City's Human Resources Department a letter voicing her concerns about Lander's continued harassment and retaliation and the City's nearly five month delay in investigating the allegations.

36. In January 2010, the process of the reappointment of the municipal court judges began. All of the municipal court judges, including Williams, submitted applications to the JNC through the City's Human Resources Department. The JNC then was briefed by Dallas City Attorney Thomas Perkins. Per the JNC's request, Perkins's briefing concerning Williams included descriptions of Williams's written complaints to the City's Human Resources Department and her EEOC filing.

37. The JNC subsequently interviewed the judges. However, while all of the JNC members are supposed to attend all of the judges' interviews, several members of the JNC did not attend Williams's interview but were still permitted to rate and vote on Williams. Williams was not afforded an opportunity to address any of the complaints made against her during the interview, nor was she aware that the JNC had been briefed on her EEOC complaints.

38. Based on this information, the JNC ranked the judges. Williams received a ranking of zero (0) from every single JNC member except one (who ranked her 9 out of 10), despite receiving an administrative judge grade and a prosecution rating equivalent to (and better than some) reappointed judges. The JNC then rated and ranked 18 candidates to refer to the Ad-Hoc Legislative Committee of the Dallas City Council, ranking Williams 17 out of 18 in order of preference. The JNC's rankings reflect its recommendation to the Ad-Hoc Legislative Committee of the City Council that Williams not be reappointed.

39. On May 24, 2010, Lander's close friend, City Councilmember Vonciel Jones-Hill, sent an email to the Ad-Hoc Legislative Committee Chairwoman Angela Hunt, and cc'd Dallas

City Attorney Thomas Perkins, asking, "are we able to have access to any complaints by or against any of the current Judges before our interviews?"

40. Three days later, in an email dated May 27, 2010, Jones-Hill reiterated her previous request to Chairwoman Hunt and City Attorney Perkins that the Council's Ad Hoc Legislative Committee be apprised of any complaints by or against any of the current municipal judges. Jones-Hill also inquired whether the City Attorney would provide the Committee with a Confidential Summary before the meeting and provide any supporting materials during the meeting.

41. On June 2, 2010, in response to Jones-Hill's requests for information concerning complaints, Perkins provided her and the Ad-Hoc Legislative Committee with a memorandum that purportedly summarized his briefing to the JNC. The memorandum (despite being titled, "Complaints Regarding Municipal Court Judges") only discussed complaints involving Williams – no complaints against other municipal court judges were mentioned, although complaints did exist. The memorandum included Lander's allegations of administrative violations against Williams (to which Williams had never been given an opportunity to respond) and Williams's July and August 2009 complaints to the City's Human Resources Department regarding Lander's discrimination, harassment and retaliation. The memorandum also detailed Williams's charges filed with the EEOC against the City.

42. In mid to late June of 2010, the Ad-Hoc Legislative Committee of the City Council confirmed and adopted the JNC's recommendations and submitted to the City Council its list of 11 candidates to fill the 11 available municipal court judge positions. On June 23, 2010, the City Council confirmed and adopted the Ad-Hoc Legislative Committee's recommendations. Williams was the only incumbent Municipal Court Judge who was not reappointed.

43. During the June 23, 2010 City Council meeting, Mayor Pro-Tem Dwaine Caraway criticized the decision to not reinstate Williams, stating the process used in determining her non-reinstatement was "unfair and unprofessional," and she "was railroaded out." He went on to comment that judges should be judged based on the merits of what they did inside the courtroom, and based on the merits, Williams was one of the best judges on the bench. Caraway further stated that Williams "was punished because she raised lady issues," and the discussions about Williams "warranted a complete vetting of the allegations, accusations that were brought to our attention." Caraway's statements clearly indicate that the decision to not reinstate Williams was based on, and in retaliation for, Williams's complaints of discrimination, harassment and retaliation, for which no proper investigation was ever conducted.

44. On June 24, 2010 at 4:15 p.m., a memorandum from Lander was slipped under Williams's office door while she worked. In the memorandum, Lander notified Williams that the next day, June 25, 2010, would be her last day and that she had until the close of business that day to remove all of her belongings.

## V.
## CAUSES OF ACTION

**A.    Violation of the TCHRA by Harassment**

45. Williams incorporates the foregoing paragraphs as if fully stated herein.

46. Williams timely filed complaints of sexual harassment with the EEOC and the TWC and has received a "Right to Sue" letter.

47. Williams has been subjected to harassment based on her sex that has been unwelcome and undesirable or offensive to her, and the harassment complained of altered a term,

condition or privilege of her employment. Defendant knew or should have known of the harassment but failed to take prompt, remedial action to eliminate it.

48. Defendant's wrongful acts and the conduct of its agents and/or employees acting within the course and scope of their employment have been the proximate cause of Williams's injuries. Williams seeks actual and compensatory damages.

### B.  Violation of the TCHRA by Discrimination

49. Williams incorporates the foregoing paragraphs as if fully stated herein.

50. Williams timely filed complaints of discrimination based on sex and disability with the EEOC and the TWC and has received a "Right to Sue" letter.

51. Williams has been subjected to discrimination based on her sex and her disability that has been unwelcome and undesirable or offensive to her, and the discrimination complained of altered a term, condition or privilege of her employment. Defendant knew or should have known of the discrimination but failed to take prompt, remedial action to eliminate it.

52. Defendant's wrongful acts and the conduct of its agents and/or employees acting within the course and scope of their employment have been the proximate cause of Williams's injuries. Williams seeks actual and compensatory damages.

### C.  Violation of the TCHRA by Retaliation

53. Williams incorporates the foregoing paragraphs as if fully stated herein.

54. Williams timely filed complaints of retaliation with the EEOC and the TWC and has received a "Right to Sue" letter.

55. Williams has suffered tangible adverse employment actions in retaliation for reporting sexual harassment and discrimination and/or her disability and associated FMLA leave, including Lander's hostile, abusive, and retaliatory actions, the City's failure to investigate and

cure the conduct, and the City's failure to reinstate Williams as a municipal court judge. This retaliation is in violation of the TCHRA.

56. Defendant's wrongful acts and the conduct of Defendant's agents and/or employees acting within the course and scope of their employment have been the proximate cause of Williams's injuries. Williams seeks actual and compensatory damages.

**D.   Violation of Title VII (42 U.S.C. § 2000e – 2(a)(1)) by Discrimination**

57. Williams incorporates the foregoing paragraphs as if fully stated herein.

58. Williams timely filed complaints of gender discrimination with the EEOC and TWC and has received a "Right to Sue" letter.

59. Williams has suffered tangible adverse employment actions due to the policies and procedures of the City of Dallas that have caused disparate treatment and/or disparate impact based on sex in violation of Title VII.

60. The City's wrongful acts and the conduct of City agents and/or employees acting within the course and scope of their employment have been the proximate cause of Williams's injuries. Williams seeks actual and compensatory damages.

**E.   Violation of Title VII (42 U.S.C. § 2000e – 2(a)(1)) by Harassment**

61. Williams incorporates the foregoing paragraphs as if fully stated herein.

62. Williams timely filed complaints of sexual harassment with the EEOC and has received a "Right to Sue" letter.

63. Williams has been subject to harassment based on her sex that was unwelcome and undesirable or offensive to her, and the harassment complained of altered a term, condition or privilege of her employment. The City knew or should have known of the harassment but failed to take prompt, remedial action to eliminate it.

64. The City's wrongful acts and the conduct of City agents and/or employees acting within the course and scope of their employment have been the proximate cause of Williams's injuries. Williams seeks actual and compensatory damages.

**F.**     **Violation of Title VII (42 U.S.C. § 2000e – 3(a)) by Retaliation**

65. Williams incorporates the foregoing paragraphs as if fully stated herein.

66. Williams timely filed complaints of retaliation with the EEOC and TWC and has received a "Right to Sue" letter.

67. Williams has suffered tangible adverse employment actions in retaliation for reporting harassment and discrimination based on sex. This retaliation is in violation of Title VII.

68. The City's wrongful acts and the conduct of City agents and/or employees acting within the course and scope of their employment have been the proximate cause of Williams's injuries. Williams seeks actual and compensatory damages.

**G.**     **Violation of the Americans with Disabilities Act (42 U.S.C. § 12131-12165 and 12202-12203)**

69. Williams incorporates the foregoing paragraphs as if fully stated herein.

70. Williams timely filed complaints of harassment, discrimination and retaliation based on disability with the EEOC and TWC and has received a "Right to Sue" letter.

71. Williams is a qualified individual with a disability as that term is defined under the Americans with Disabilities Act of 1991 ("ADA") and was capable of performing the essential functions of her employment with the City.

72. Williams's disability substantially limited a major life activity, preventing her from living a normal life, leaving her home on a regular basis, and working generally.

73. The City was aware of Williams's disability, or perceived Williams to have a disability, and began harassing, discriminating and retaliating against Williams in various ways

following her FMLA leave, including rating Williams negatively on performance reviews. When Williams complained of the discrimination to the City and made a claim with the EEOC, the City further retaliated by denying Williams further employment.

74. Williams seeks actual and compensatory damages.

**H.** **Violation of the Family Medical Leave Act (29 U.S.C. § 2601 *et seq*.)**

75. Williams incorporates the foregoing paragraphs as if fully stated herein.

76. Williams timely filed complaints of harassment, discrimination and retaliation based on disability and taking FMLA leave with the EEOC and TWC and has received a "Right to Sue" letter.

77. Williams qualified for, was approved by the City for, and took FMLA leave in January and February 2009 for serious illness. During and following her FMLA leave, Williams was harassed and discriminated against for taking such leave.

78. When Williams reported the harassment and discrimination to the City, the City failed to respond and otherwise retaliated against Williams.

79. Williams seeks actual and compensatory damages for the City's violations of the FMLA.

**I.** **Section 1983 Under *Monell***

80. Williams incorporates the foregoing paragraphs as if fully stated herein.

81. At all times relevant to this suit, both the City Council and Administrative Judge Lander were policymakers for the City and the Municipal Courts and were ultimately responsible for the effective institution of policies and procedures that affected Williams.

82. Through these policymakers, the City had a formal and informal custom, policy, habit and/or practice of the following:

(a) Basing its decisions for reappointment of municipal court judges on allegations of misconduct, for which no name clearing hearing nor other opportunity for response (during the interview process or otherwise) was provided, in violation of a person's rights to due process;

(b) Considering in its decisions for reappointment of municipal court judges that employees filed charges of harassment, discrimination and retaliation against the City under Title VII, the ADA, and the FMLA in violation of those Acts;

(c) Providing negative reviews to employees who took FMLA leave, in violation of that Act;

(d) Filing and creating written allegations of misconduct against employees without permitting such employees a name clearing hearing or other opportunity to respond, in violation of a person's rights to due process; and

(e) Assigning courts, dockets, equipment, and responsibilities to municipal court judges based on their reactions to sexual advances and in retaliation for such reactions, in violation of Title VII; and

(f) Refusing to reinstate senior female municipal court judges.

83. Leading up to and following Williams's discharge from the City of Dallas, false and stigmatizing charges were made against her, including that she entered the offices of fellow municipal court judges without permission. These statements were considered by the Dallas City Council when making its decision on reinstatement and were later published in the Dallas Morning News, D Magazine, the Dallas Observer online, and several Internet sites. In October 2010, Williams wrote to the City asking to be confronted with the allegations against her, but the City

failed and/or refused to provide her with an opportunity for a name clearing hearing or any other means of confronting the allegations made against her. Williams was not notified of these stigmatizing allegations during her employment, and in fact never became aware of them until after her termination when she obtained access to the records through a Public Information Act Request. These public allegations have significantly affected her ability to obtain employment with other municipal courts in Texas and in the legal profession generally, and the City's custom of failing to allow for any opportunity to confront the charges has violated Williams's substantive due process rights.

84. Although Williams reported these violations to David Etheridge and the Dallas Human Resources Department, and the City Council was briefed on the violations, no action was taken. The City was knowingly and deliberately indifferent to the violations of Williams's constitutional and other federally-protected rights.

85. Defendant's wrongful acts constitute a violation of 42 U.S.C. section 1983 in that the Defendant, acting under color of law as a municipal corporation and officials empowered by that municipality (including the Dallas City Council and Administrative Judge Lander), willfully and intentionally violated Williams's civil rights as guaranteed by the Constitution of the United States, for which the suit seeks redress.

86. Williams has been legally, proximately and substantially injured by this wrongful conduct. Among other things, Williams's reputation has been severely damaged, limiting her opportunities for other employment.

87. Williams has further suffered emotional distress and related medical expenses. Williams seeks actual and compensatory damages.

## VI.
## EXPERT AND ATTORNEYS' FEES

88.     Williams seeks recovery of her expert and attorneys' fees under Federal Rule of Civil Procedure 23, the TCHRA, Title VII, the ADA, the FMLA and 42 U.S.C. section 1983.

## VII.
## JURY DEMAND

89.     Williams demands a trial by jury on all issues of fact and damages in this action.

## XIV.
## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Williams respectfully prays that this Court grant the following relief:

   b.   Enter a judgment that Defendant's acts as set forth herein are in violation of the laws of the State of Texas and the United States;

   c.   Award Williams lost wages, including back pay, front pay and lost fringe benefits;

   d.   Award Williams compensatory damages;

   e.   Award Williams the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees;

   f.   Award pre-judgment interest and post-judgment interest at the maximum rate allowed by law;

   g.   Award costs of court; and

   h.   Grant Williams such other and further relief as this Court finds necessary and proper.

Respectfully Submitted,

*/s/ Brian A. Calhoun*
**BRIAN A. CALHOUN**
State Bar No. 24044827
**GWEN E. PILGRIM**
State Bar No. 24046632
**CALHOUN PILGRIM LLP**
325 N. Saint Paul St., Suite 3950
Dallas, Texas 75201
Telephone: (214) 981-9200
Facsimile: (214) 981-9203

**ATTORNEYS FOR PLAINTIFF
STACI WILLIAMS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above document was served on all counsel of record via the Court's ECF/CFM system in accordance with the Federal Rules of Civil Procedure on this 16th day of August, 2011.

*/s/ Brian A. Calhoun*
**BRIAN A. CALHOUN**